WISE, Presiding Judge.
The appellant, David Dwayne Riley, Jr., was convicted of capital murder for the killing of Scott Michael Kirtley. The murder was made capital because he committed it during the course of a first-degree *672 robbery or an attempt thereof, a violation of § 13A-5-40(a)(2), Ala.Code 1975. The jury unanimously recommended that Riley be sentenced to death. The trial court followed the jury’s recommendation and sentenced him to death. Riley filed a motion for a new trial, which the trial court summarily denied. This appeal followed.
Because this is a case in which the death penalty has been imposed, we have reviewed it for plain error. See Rule 45A, Ala. R.App. P. Although the lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice Riley may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala.1985). Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review ... whenever such error has or probably has adversely affected the substantial right of the appellant.”
'“[This] plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 n. 14 (1982)).
The following summary of the relevant facts, as prepared by the trial court, may be helpful to an understanding of this case:
“Thomas Newbern, the State’s first witness, testified he went to the Dandy’s Package Store Number Two located on Highway 72 in Lauderdale County, Alabama at approximately 7:30 p.m. on January 10, 2005. Another customer was waiting to be served but there was no clerk to accept payment. Mr. Newbern went to the back of the store to find the clerk and discovered the body of Scott Michael Kirtley with obvious major trauma to his head. Mr. Newbern found a cordless phone behind the counter and called the 911 operator.
“Lisa Etienne, the keeper of the records for the 911 system, testified that Mr. Newbern’s call was received at 7:49 p.m.
“Suzanna Taylor, an investigator for the City of Florence Police Department, testified that she responded to the scene and identified for the jury a crime scene video and numerous pictures which were taken by law enforcement personnel. There were a total of three cameras attached to recording devices in the package store at the time of the murder. The tapes from two of the recorders had been removed but the third camera and recorder was operating when law enforcement arrived.
“Jackie Beaver, the owner of Dandy’s Package Stores Number One and Two, testified that she had operated the package stores for about twenty-two years and that Scott Michael Kirtley was employed as a clerk. He had been working at the store for approximately two years. On the day in question Mr. Kirt-ley began his shift at 4:00 p.m. and was scheduled to work until closing at 11:00 p.m. She went to the store when she heard that something had happened and identified the body of Mr. Kirtley. She testified that the store had three functioning cameras recording the events in the store 24 hours each day. The one camera that was still operating at the store when officers arrived had only been functioning since the Friday before this murder on Monday. After checking the register and the inventory she determined that $459.17 had been stolen along with two bottles of liquor and some Newport brand cigarettes.
*673 “Officer Bennie Johnson, of the Florence Police Department, was on duty and responded to the scene. When he arrived other officers were reviewing the tape recording of the robbery made by the one camera system that still had a tape in it when they arrived. The decision was made to make copies of the tape and distribute them to the local media and to ask for the public to help identify the robber shown in the video. Officer Johnson took the tape to the local newspaper office to have it duplicated. Later, after receiving information from the public, he went to the home of Mr. Dewon Jones and collected a pistol from Mr. Jones’ closet and two magazines for the gun from a drawer.
“Reginald Owens, who lives in the vicinity of the package store, testified that he saw the defendant on the day in question between fifteen minutes until eight o’clock and eight o’clock. They spoke for a few minutes and the defendant walked away. The defendant was polite and calm. Later Mr. Owens gave police permission to search a tree house in his backyard.
“Officer Eric Pollard collected evidence from Mr. Owens’ tree house. Officer Pollard found two video tapes from the package store, two bottles of liquor and one bullet. Officers had responded to the Owens’ house because of information given to them by Mr. Owens’ son. The videos were the tapes from the package store and when played clearly showed this defendant approach the counter and pull a gun on Mr. Kirtley. Mr. Kirtley fully cooperated with Mr. Riley by putting all money from the register in a paper bag along with two bottles of liquor and Newport cigarettes. During the robbery a customer arrived. Mr. Riley backed away, instructed Mr. Kirtley to ‘make the sale’ to that customer and hid the gun. While Mr. Kirt-ley was waiting on that customer Mr. Riley calmly counted the money. After the customer departed, the defendant ordered Mr. Kirtley to go to the back of the store, beyond the range of the video cameras. The audio portion of the tape records a gunshot, a scream, a pause, a second gunshot, a pause and a third gunshot. Mr. Riley is then seen collecting the paper bag containing the money, liquor and cigarettes and taking the tapes from two of the three video recorders. The videos also show that the defendant had been in the store earlier in the evening to purchase two soft drinks and show the defendant looking in the direction of the two store cameras whose tapes were taken after the murder.
“Officer Chuck Hearn and two other Florence Police officers went to the defendant’s house in an unmarked patrol car. Defendant ran toward the car and the officers arrested him. Mr. Riley told them he mistook their car for that of a friend coming to pick him up.
“Doctor Adam Craig, medical examiner, testified that upon examining the body of Mr. Kirtley he determined that he had been shot three times in the head. One shot was to the right side of Mr. Kirtley’s head and was a contact wound. Two shots were to the left side of the head and were fired from close range. Any one of the shots would have been fatal but Dr. Craig could not tell which shot was first.
“Amanda Davenport, age seventeen, testified that the defendant and Mr. De-won Jones came to her house on the day in question around 5:15 p.m. and stayed for approximately thirty minutes. Mr. Jones was in possession of a pistol. Mr. Riley did not appear to be under the influence of any intoxicant.
“Doug Sanderfer Jr., a friend of the defendant, testified that he saw Mr. Ri *674 ley and Mr. Jones between 4:30 p.m. and 5:00 p.ra. on January 10th. Mr. Riley told Mr. Sanderfer that he needed money to pay his child support. Mr. Riley did not appear to be under the influence of any intoxicant at that time but he acknowledged that the defendant is a frequent user of illegal substances. After he heard about the shooting at the package store, Mr. Sanderfer called the defendant. The defendant told Mr. San-derfer that he had committed the robbery, that a customer had interrupted the robbery, that he took the clerk to the back of the store and that he had shot him. Mr. Riley asked Mr. Sander-fer to come to his house and pick him up. After the phone conversation, Mr. Sanderfer decided not to go to Mr. Riley’s house.
“The defendant testified in his own behalf. Outside the presence of the jury he acknowledged to the Court that he understood that he had a right to testify if he wished and a right not to testify if he wished not to. He further acknowledged that his attorneys had advised him not to testify but that he wished to testify anyway. Mr. Riley told the jury that he committed the robbery to get money to pay a drug debt to Mr. Jones but that he had no intention of killing the clerk. He directed Mr. Kirtley to the back of the store to lock him in the back room but when Mr. Kirtley turned around quickly Mr. Riley feared Mr. Kirtley was going to hit him. In response to Mr. Kirtley’s actions Mr. Riley said he struck Mr. Kirtley with the gun and it fired. Mr. Riley said his ears began to ring and he remembers nothing thereafter. Mr. Riley claimed to be under the influence of cocaine that he ingested shortly before the murder.”
(C.R. 221-26.)
The following evidence may also be helpful to an understanding of this case:
In addition to the testimony set forth above, Sanderfer also testified that, when he saw Riley and Jones on the afternoon of January 10, 2005, Riley started to talk to him and to tell him something, but Jones told him to be quiet. When he talked to Riley later that night, Riley told him that he shot the victim once, that the victim was screaming, that he shot the victim a second and a third time, and that it was done. He further testified that Riley said he did not know why he shot the victim.
Additionally, Sanderfer testified that, at one time, he had owned the gun that was recovered from Jones. He explained that the gun had a defect and that he had to work with the gun each time he put a cartridge in the chamber. Finally, he stated that, approximately two weeks before the murder, Riley had helped him sell the gun to Jones.
The State also introduced recordings of several telephone calls Riley made while he was in jail after the offense. During one conversation, Riley told a friend that someone wanted the money he had borrowed from him and that he did not have a choice. Also, on January 13, 2005, during a conversation with his stepmother, Riley made the statement that one tape is what screwed everything up for him. Finally, during a conversation on January 19, 2005, Riley told his brother to tell Sanderfer that he is not the one who is snitching, that Jones is, and that he is trying to get in touch with him so they have the same story and don’t get “f_up together”; to tell Sanderfer that he needs to know if Sanderfer is a punk or they are both going to get “f_ up” because he doesn’t know what has been said; and to tell Sanderfer that he can play dumb all day, but will have to say something eventually. He also told his brother to tell Amanda *675 Davenport to stop running her mouth and that, if she does not say what was really said, she could tell them that Jones was the one talking “the s — ” and that he was telling him that he did not really want to do it.
Riley testified on his own behalf regarding the events that occurred on January 10, 2005. He testified that his mother had taken him to a couple of job interviews that day and that, during that time, Jones had telephoned him. Riley explained that he owed Jones some money and that he knew Jones wanted it. He spoke to Jones briefly and told him he would call him back.
Riley testified that he telephoned Jones that afternoon and told Jones they could get together to talk. Afterward, they walked around the neighborhood, stopped at Amanda Davenport’s house, and stopped at Jones’s friend’s house. Riley admitted that he had used drugs on a regular basis. He testified that Jones had been giving him drugs and that he had $20 or $80 and offered to give it to Jones toward what he owed him, but that Jones wanted more. He stated that Jones kept talking about robbing a store and that he tried to make excuses, but that “one thing [led] to another and [he] had no other choice but to go into this store.” (R. 701.) With regard to the robbery at Dandy’s, Riley stated:
“It was a last minute call but it was pushed on to me to get some money that I owed so, yes, it was kind of planned.”
(R. 696.) He also stated that he was strung out at the time of the incident and that, in fact, he “had just took a hit before walking in that door.” (R. 698.)
Riley testified that he went into the store and was under the influence of drugs and was nervous. He also testified that Jones was supposed to wait outside and telephone his cellular telephone if anyone drove up. However, Jones did not do that, and another customer came into the store during the robbery. Regarding shooting the victim, Riley testified:
“I took Mr. Kirtley back there in that store to lock him in a room. Not to hurt him. I had no intentions to hurt this man. I wanted him out of the room so he couldn’t see which way I went and couldn’t call the police right then. I would have extra time to get away. And as we was walking into that room, he turned around and caught me off guard and I went to hit him. I had — I’m left handed so as I went to hit him, the gun went off and that’s pretty much all I can remember because that scared me that the gun went off, and then I seen him fall and then my mind just kind of goes off into a blur, you know, panic and I’m high.”
(R. 702.) He also testified that the victim made a move as if to hit him, that he swung reflexively to hit the victim and did not think about the fact that he was holding the gun, that the gun went off, that his ears started ringing after the first shot, that he was high on crack cocaine, that his mind went blank, and that he did not remember anything else until he woke up in a jail cell the next morning.
Riley testified that he did not intend to pull the trigger on the gun, that he and Jones never planned to harm or kill the victim, and that Jones actually had to remind him to take the gun into the store. He also testified that, even during the robbery, he never thought about killing the victim. Finally, he repeatedly stated that he was sorry and that he did not intend to kill the victim.
On cross-examination, the State immediately asked Riley if he was a liar and if he was lying to the jury; if he was really sorry or if, instead, he was proud of being *676 famous based on comments he had made during a telephone call from his jail cell; if he did not intend for the killing to happen; and if he was truly remorseful. It also questioned his testimony that he only intended to put the victim in the back and then to run away, his testimony that the victim turned and was shot accidentally, his testimony about the location of the gun and the number of times it fired, and his testimony that he did not remember anything after the first shot.
The State questioned Riley about why he went into the store before the robbery and suggested that he was looking to see where the video cameras were located. It also questioned Riley about his testimony that he did not intend to kill the victim. Riley did not deny shooting the victim three times, but insisted that it was not on purpose and that he did not remember the second and third shots. After Riley stated that he took the victim to the back to lock him in a room, the prosecutor stated: “You took him back there to execute him and you just know that you can’t tell this jury that because it’s capital murder.” (R. 720.) The prosecutor also questioned Riley about the time between the three shots and the statement he made to Sanderfer about the shooting, and Riley again stated that he could not remember anything after the first shot.
The prosecutor questioned Riley about seemingly inconsistent statements he had previously made about the offense. He also questioned Riley about his testimony about head injuries and about his mental health history. During that questioning, the following occurred:
“[PROSECUTOR:] You’ve never even seen a mental health professional for treatment of any kind, have you?
“[RILEY:] When I was on juvenile probation I was supposed to see some but they never did send me, sir.
“[PROSECUTOR:] David Riley wasn’t going to do what the authorities told him to do, did you?
“[RILEY:] I’m sorry.
“[PROSECUTOR:] They tried to help you in the juvenile court system and you just wouldn’t let them?
“[RILEY:] No, sir. They were supposed to send me to a doctor but they instead sent me to a boot camp.”
(R. 724.)
Finally, the following occurred during the State’s cross-examination of Riley:
“[PROSECUTOR:] I’m saying the truth to you, sir, is whatever you need to say at the .time to try to save yourself?
“[RILEY:] Sir, I’ve been truthful. I owed Dewon some money. He left me no choice but to go into that store and get the money. I went to get the money with no intention to hurt Mr. Kirtley. I can’t make you believe that. I can’t.
“[PROSECUTOR:] You sure can’t.
“[RILEY:] That’s the truth.
“[PROSECUTOR:] It’s not the truth.
“[RILEY:] I’m sorry.
“[PROSECUTOR:] You’re a convicted felon, aren’t you?
“[RILEY:] Yes, sir. I been took to trial since I’ve been arrested, yes, sir.
“[PROSECUTOR:] You were convicted of burglary and you are convicted of theft in the second degree, right?
“[RILEY:] Yes, sir.
“[PROSECUTOR:] Yet you want this jury to believe what you’re saying in the face of all this overwhelming evidence is to .the contrary.
“[RILEY:] Sir, that case has nothing to do with this case.”
(R. 727-28.)
On redirect examination, Riley testified that he had used cocaine, crack, and mari *677 juana on the day the incident occurred. He also stated that he had taken a hit of crack just before he went into the store and that, when he went into the store, he was high and his mind was racing and was not really focusing. Riley testified that cocaine makes a person do things he would not normally do and affects his ability to make rational decisions. He also reiterated that he did not intend to harm or kill the victim, that the- victim surprised him when he turned around, that he reacted reflexively, that the gun went off, that he did not remember anything else, and that he was sorry for what happened.
On re-cross-examination, the State questioned Riley about whether his motive for taking the money was to pay off Jones or to get money to buy more drugs and about what he did with the money he took from the store. It also questioned him about the two video recordings he took from the store and the location of the blood spatter in the store.
During his closing argument, the prosecutor noted that the only argument the defense raised at trial was that Riley did not intend to kill the victim. He also argued that the killing had to be intentional because Riley fired three shots to the victim’s head. Finally, he argued that the video and audio recordings were “inconsistent with what he’s trying to sell to you today.” (R. 746.)
During his closing argument, defense counsel argued that Riley’s mind was messed up and was not working properly on the night the offense occurred. To support his argument, he pointed to San-derfer’s testimony about his conversation being all screwed up and Riley being deluded; the fact that Riley left a video recording in the store; and testimony that Riley ran toward officers when they went to his house to arrest him. Defense counsel also argued that the gun Riley had was unsafe and unreliable because it did not work properly and that the location of the gunshot wounds and the position of the body supported Riley’s testimony that the shooting was not intentional but was accidental.
During his rebuttal closing argument, the prosecutor argued:
“You know, people accepting responsibility for what they’ve done, I mean, not accepting responsibility for what they’ve done is a major problem in our country today. The criminal justice system is criticized. We’re not doing something about it when something like this happens. What are we going to do about it? Well, manslaughter. Everybody go home. Sorry about it. That’s it. It does not get any worse than this case. The facts don’t get any worse and you can see that, and I respect [defense counsel] as a lawyer. He’s done a fine job but he’s dealing with very difficult facts that he’s somehow trying to say somebody with common sense, you have to check it at the door to go with what they’re saying.
“When he first says — well, the thing about what they’re saying — the thing that I’m so thankful about is that we do have video so these are things that they could say and could try to do if there was no video, but there is. And watch it. Watch it again if you have some question about it, all this stuff. And he’s high. He’s a whacked out, drug addict junkie.
“Well that night you saw it. I’ve seen the video. If he was some whacked out junkie and somebody comes in there and interrupts a robbery in progress, is he going to have the wits about him to step back calmly, put that gun away so the guy doesn’t see it and start counting the money? That’s on the video. He had the opportunity right then to run out of *678 that store. Something has gone wrong. The lookout has messed up for me. I’ve got to get out of here. He chose to do something else and now he says I’m sorry. I’m sorry. What did he say when he’s talking to his cousin on the phone in jail? Let’s hear that clip.
“(Jail phone call played)
“Yes, that’s remorse. They want to say again that we don’t know what happened back in that back room. We know they only had three videos in a small liquor store. They didn’t put one in the back room but you can hear what happened and, you know, again I respect the way this man has tried this case. But for him to say — for him to try to tell you that Scott Kirtley did not suffer— you heard it. I have watched that tape many times and I cannot watch it without — it just sends chills through me to hear him die. I mean, it’s just — it’s awful.
“Common sense. Listen to it again if you — if there’s any question in your mind about it. What did his friend say he said the night it happened? It’s funny to me — not funny. But it’s interesting. I’m going to get on the stand and tell you the truth but when he’s confronted with facts that he can’t explain, what does he do? I don’t remember that. I don’t know what happened. I don’t remember. He can remember smoking dope, smoking this, doing this, going here, doing all this stuff but when he’s in there intentionally executing the man, and he can’t explain. I don’t know what happened.
“And they want to say, well, that was unintentional? I mean what did he do? If this was unintentional, again he was so high he didn’t know what he was doing. What would he have done next? I guess he would’ve run out of the store if that’s — this is some oops but what did he do? Again the video. Goal driven behavior. He has killed the only live witness to his crime and now what does he do? He gets the videotapes and flees with them. Stores them up in a tree house. He thinks he’s gotten away with it.
“You heard what Jackie Beavers said. The video he left there wasn’t even working until Friday, the 4th. They — if they were casing it. He thought he had gotten away with it so what does he try to do? He tries to lie to the police when they pick him up and they take him down to the police station. He doesn’t know that they have seen the video. He thinks he can shoot bull his way through that. Watch that tape. He ain’t some foaming at the mouth drug addict. He’s in there trying to BS the police. I was out walking around, all that kind of stuff when Randy England says don’t BS me. We know what you’ve done, you know, I’ve got you. And Randy tells him point by point what’s on that video. The gig is up for him.
“Capital murder. What does he say to his mother about it in this jail recording?
“(Jail phone call played)
“That one tape screwed the whole thing up for him. You can see that. Common sense. Use it. We want you to use it. They want to say that there’s not any evidence that he shot this man while he was down. There’s not any evidence that he shot him while he was up. If there’s some criticism of our police department for not hosing down the place with luminol or they didn’t do a valid enough search of this crime scene, watch the crime scene video meticulously going through there looking, showing you the absence of anything other than 17 inches and below in that little closet; that’s significant, the ab *679 sence of something that they say should be there. We want you to consider that when you do — when you look at that. It’s obvious what your verdict should be.
“And they talk about sympathy. We’re sympathetic. What they’re trying to do is generate sympathy for this guy is what they want to do. Poor David. It’s a tragedy. This is an intentional killing that he caused. If you have any sympathy for him you should check that at the door.
“We tried to help this guy. He said I’m in juvenile court. Yeah, we tried to rehabilitate him. Didn’t work. That’s what’s wrong with our system that people criticize and you have the power and the authority to do something about it, and you should.”
(R. 759-64) (emphasis added). Finally, he argued that Riley intentionally shot the victim and that, in making his statement to law enforcement officers and in testifying in court, Riley “tried to BS his way through.” (R. 764.)
Afterward, the trial court gave its instructions to the jury. During its oral charge, the trial court instructed on the lesser included offenses of felony-murder, intentional murder, and reckless manslaughter. It also instructed the jury on voluntary intoxication. The trial court did not, at any time, instruct the jury as to the purposes for which it could and could not consider evidence about Riley’s prior convictions.
Riley argues that the trial court erred because it did not instruct the jury that it could consider evidence about his prior convictions only for impeachment purposes and not as substantive evidence of guilt. In an interrelated argument, he also contends that the prosecutor improperly impeached him with evidence about juvenile adjudications. However, he did not first present these arguments to the trial court. Therefore, we review them for plain error. See Rule 45A, Ala. R.App. P.
With regard to impeachment by evidence of conviction of a crime, Rule 609, Ala. R. Evid., provides, in relevant part:
“(a) General Rule. For the purpose of attacking the credibility of a witness,
“(1)(A) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and
“(B) evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused....
[[Image here]]
“(d) Juvenile or youthful offender adjudications. Evidence of juvenile or youthful offender adjudications is not admissible under this rule.”
Also, regarding evidence that is admitted for limited purposes, Rule 105, Ala. R. Evid., provides:
“When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.”
In Ex parte Minor, 780 So.2d 796 (Ala.2000), Minor was convicted of capital murder of a victim who was less than fourteen years of age and sentenced to death for the killing of his two-month-old son, Ebious Jennings. At trial, his defense was that he did not cause the injuries that resulted in the victim’s death. During direct examination by defense counsel, Minor admitted that he had prior convictions *680 for second-degree assault, unlawful possession of cocaine, and second-degree rape and that he had escaped from the county jail while he was awaiting trial on the capital murder charge. On cross-examination, he admitted that he had made several inconsistent statements about the incident, but contended that he did so to get released on bond and to protect the victim’s mother.
After this court-affirmed Minor’s conviction, he petitioned the Alabama Supreme Court for review, arguing “that the trial court committed reversible error in failing to properly instruct the jury regarding his prior convictions — 1) that it could consider the evidence of Minor’s prior convictions only for impeachment purposes and 2) that it could not consider the prior convictions as substantive evidence .of Minor’s guilt.” 780 So.2d at 799. The Alabama Supreme Court agreed with Minor, reasoning as follows:
“Minor did not at trial request a limiting instruction regarding the evidence of his prior convictions and did not at trial object to the court’s failure to give such an instruction. However, this Court’s review of a death-penalty case allows us to address any plain error or defect found in the proceeding under review, even if the error was not brought to the attention of the trial court. Rule 39(a)(2)(D) and (k), Ala. R.App. P.... Even under the stringent standards applicable to plain-error review, we conclude that the failure to properly instruct the jury in a capital-murder case as to the proper use of evidence regarding prior convictions constitutes reversible error.
“When a defendant testifies at trial, the State is entitled to impeach the defendant’s credibility by introducing evidence of prior convictions. See Rule 609(a)(1)(B), Ala. R. Evid. In considering the admissibility of prior convictions for impeachment purposes, this Court has stated:
‘“The high probability of prejudice against a defendant makes the admissibility of his previous criminal convictions a controversial issue.
“ ‘This notion of prejudice has been said to encompass two tendencies of juries: 1) The tendency to convict not because the defendant is guilty of the charged offense, but because evidence introduced shows he is a bad person who should be incarcerated regardless of his present guilt, and 2) the tendency to infer that, because the defendant committed a prior crime, he committed the crime charged. Thus, a defendant wishing to testify in his own behalf faces this dilemma: Testify and run the risk of greatly prejudicing his defense by introduction of prior convictions to impeach, or refrain from testifying and damage his defense by not telling his side of the story.
“ ‘The rationale for admitting impeachment evidence when a defendant, or any other witness, testifies is that certain evidence of prior criminal acts and general character relates to a person’s propensity to lie; therefore, the jury should' have and use this evidence, but only for the limited purpose of evaluating the witness’s veracity.’
“McIntosh v. State, 443 So.2d 1283, 1285 (Ala.1983). (Citations omitted.) The law in Alabama is clear that ‘evidence of prior criminal convictions for impeachment purposes may not be considered or taken into account in determining a defendant’s guilt of the offense for which he is prosecuted.’ King v. State, 521 So.2d 1360, 1361 (Ala.Crim.App.1987) (quoting 81 Am.Jur.2d Witnesses § 569 at 575 (1976)). It is well settled that *681 when prior convictions are introduced for impeachment purposes the defendant is entitled, upon request, to have the jury instructed that those prior convictions cannot be considered as substantive evidence of guilt of the crime charged. King, supra. The issue in the present case is whether, absent a request or an objection by the defendant, the trial court has a duty to instruct the jury that evidence of prior convictions is not to be considered as substantive evidence of guilt. We hold that the trial court does have such a duty in a capital-murder case.
[[Image here]]
“This Court has never addressed the question whether a trial court has a duty to sua sponte instruct the jury as to the limited purpose for which it may consider evidence of prior convictions. The Court of Criminal Appeals has held that the trial court does not have a duty, sua sponte, to inform the jury that evidence of inconsistent statements may be considered only for the purpose of impeaching a witness’s credibility. Varner v. State, 497 So.2d 1135 (Ala.Crim.App.1986); Weaver v. State, 466 So.2d 1037 (Ala.Crim.App.1985). However, Varner and Weaver were not capital cases, and the doctrine of plain-error review did not apply. In addition, those cases do not contain any holding or analysis with respect to impeachment by prior convictions. The Court of Criminal Appeals held in Pardue v. State, 571 So.2d 320, 327 (Ala.Crim.App.1989), rev’d on other grounds, 571 So.2d 333 (Ala.1990), that defense counsel’s failure to request a limiting instruction or to object to the trial court’s failure to instruct the jury regarding the defendant’s prior convictions waived the issue for review. However, Pardue was not a capital case, and the doctrine of plain-error review did not apply.
“The State argues that the trial court was not required to give the jury a limiting instruction, absent a request by Minor, citing Charles W. Gamble, McEl-roy’s Alabama Evidence, § 165.01(2) (5th ed.1996):
“‘Once the accused has been impeached by one of the permissible impeachment forms, the defense may want to take steps to minimize or offset the impact of the impeachment. The accused is entitled to have the jury instructed that such evidence is to be considered only as affecting the accused’s credibility as a witness and not as tending to show guilt. The court is not required to give such an instruction unless the accused requests that it be given.’
“However, this Court has acknowledged the inherently prejudicial nature of evidence of a defendant’s prior convictions. Cofer v. State, 440 So.2d 1121, 1124 (Ala.1983) (‘[ejvidence of prior bad acts of a criminal defendant is presumptively prejudicial to the defendant’). ‘The general exclusionary rule bars the state from introducing evidence of an accused’s prior criminal acts for the sole purpose of proving the propensity of the accused to commit the charged offense.’ Hobbs v. State, 669 So.2d 1030, 1032 (Ala.Crim.App.1995). Thus, evidence of prior convictions is admissible only for limited purposes. ‘The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.’ Gofer, 440 So.2d at 1123 (quoting Charles W. Gamble, McElroy’s Alabama Evidence § 69.01 (3d ed.1977)). The general exclusionary rule ‘protects the defendant’s right to a *682 fair trial’ by seeking ‘ “to prevent conviction based on a jury belief that [the] accused is a person of bad character. The jury’s determination of guilt or innocence should be based on evidence relevant to the crime charged.” ’ Cofer, 440 So.2d at 1128 (citation omitted). Thus, it naturally follows that the trial court should take all necessary precautions to ensure that when evidence of a defendant’s prior convictions is admitted into evidence, the jury is properly instructed on the purpose for which it may consider that evidence. This includes instructing the jury, sua sponte, that it may not consider the evidence of prior convictions as substantive evidence that the defendant committed the charged offense.
[[Image here]]
“In the present case, the trial court gave this vague instruction on the use of impeachment evidence:
“ ‘Now, evidence has been introduced in this case for the purpose of impeaching certain witnesses and discrediting their testimony.
“ ‘The law allows witnesses to be impeached in any number of ways. For example, a witness may be impeached by proof of convictions of crimes involving moral turpitude or a witness may be impeached by contradictory statements made by the witness either on the stand while testifying or at other times and other places, whether under oath or not.
“ ‘But the fact that a witness has been impeached and successfully impeached does not mean that you must necessarily disregard that witness’ testimony, either in whole or in part, for there may be other facts and evidence or other testimony or other evidence that in your judgment may tend to corroborate either all or part of that witness’ testimony. And as I have already told you, you are the sole and exclusive judges of the credibility of the witnesses and the weight that you will accord their testimony.’
“The trial court did not tell the jury that the evidence of Minor’s prior convictions could not be considered as substantive evidence that he committed the crime charged. Because the jurors were not so instructed, they were free to consider the prior convictions for any purpose; thus, they could consider the probability that Minor committed the crime because he had demonstrated a prior criminal tendency. Allowing the jury to make such use of the evidence was highly prejudicial and constitutes reversible error. See Randolph v. State, 348 So.2d 858 (Ala.Crim.App.1977) (conviction reversed because the trial court failed to adequately distinguish between impeachment evidence and substantive evidence).
“The failure to instruct a jury in a capital-murder case as to the proper use of evidence of prior convictions is error, and that error meets the definition of ‘plain error.’ That failure is ‘so obvious that [an appellate court’s] failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.’ [Ex parte] Womack, 485 So.2d [766,] 769 [ (Ala.1983) ]. The Court of Criminal Appeals determined that there was no plain error because the trial court could have ‘reasonably determined that ... defense counsel had elicited Minor’s admission of the prior convictions as part of trial strategy and did not want to call additional attention to the evidence through an instruction to the jury.’ 780 So.2d at 773. We disagree. Assuming the trial court did believe that the failure to request the instruction was a trial tactic, the trial court could have easily inquired *683 as to whether defense counsel wanted the instruction given. Considering the presumptively prejudicial nature of evidence of a defendant’s prior convictions, we consider it incumbent on the trial court to ensure that the jury was instructed on the proper use of such evidence. We conclude that the failure of the trial court to instruct the jury that it could not use such evidence as substantive evidence of guilt ‘has or probably has’ substantially prejudiced Minor; thus, it satisfies the plain-error standard. See Rule 39(a)(2)(D) and (k), Ala. R.App. P.
“Furthermore, the prosecutor drew increased attention to Minor’s prior convictions through his cross-examination. On cross-examination, Minor provided details concerning each of the prior convictions. He claimed that the second-degree assault charge was based on a shooting that was done in self-defense; that the second-degree rape charge was based on the statutory rape of a female who had lied about her age; and that the drug-possession charge was based on drugs that were not his. The prosecutor used these elaborations to argue that Minor failed to take responsibility for his actions. Specifically, after Minor testified that he had pleaded guilty to possession of a controlled substance but that the drugs were not his, the following colloquy occurred:
“‘[Prosecutor]: So that was not your drugs, either?
“ ‘[Minor]: No, it was not.
“ ‘[Prosecutor]: And you did not kill Ebious?
“‘[Minor]: No, I did not kill Ebious.’
“(R. 1259.) Thereafter, the prosecutor commented: ‘Actually, Mr. Minor, you have got an explanation for everything to minimize your responsibility, don’t you?’ Considering these statements in light of ‘1) [t]he tendency [of juries] to convict not because the defendant is guilty of the charged offense, but because evidence introduced shows he is a bad person who should be incarcerated regardless of his present guilt, and 2) the tendency [of juries] to infer that, because the defendant committed a prior crime, he committed the crime charged,’ McIntosh, 443 So.2d at 1285, we must conclude that the trial court’s failure to instruct the jury that Minor’s prior convictions could not be used for those purposes constitutes a particularly egregious error. Therefore, we reverse the judgment of the Court of Criminal Appeals and remand for that court to order a new trial.”
Ex parte Minor, 780 So.2d at 799-804 (footnote omitted).
Shortly thereafter, in Snyder v. State, 893 So.2d 482, 485-87 (Ala.2001), the Alabama Supreme Court limited its holding in Ex parte Minor, reasoning as follows:
“This' Court, in finding that plain error had occurred in Ex parte Minor, recognized that Minor’s testimony was extremely damaging, that the need for an instruction limiting the use of the evidence was obvious, and that the failure to give the instruction was so prejudicial that it affected Minor’s substantial rights. While the Court found plain error in the trial court’s failure to instruct the jury on the purpose of the evidence of Minor’s prior conviction, the Court’s holding in that regard did not establish a per se rule. See United States v. Waldrip, 981 F.2d 799 (5th Cir.1993) (clarifying United States v. Diaz, 585 F.2d 116 (5th Cir.1978), and holding that whether a failure to instruct on the limited use of prior-conviction evidence was error was to be determined on a case-by-case basis). Thus, each inquiry re *684 garding the propriety of an instruction on the use of evidence of prior convictions presented for impeachment purposes must be determined on a case-by-case basis.
“In the present case, Snyder testified on direct examination that he had pleaded guilty to second-degree theft of property. At the beginning of the state’s cross-examination, the following occurred with regard to that prior conviction:
“‘[Prosecutor]: Of course, you said that — I believe you said you caught a case in '87. Is that your word? You caught a case. Is that what you said?
“ ‘[Snyder]: May have, yes, sir.
“‘[Prosecutor]: That you caught a case in '87 and that case was theft of property?
“ ‘[Snyder]: Yes, sir.’
“(R. 3111.) The prosecutor did not question Snyder further about this conviction. Nor did the prosecutor emphasize Snyder’s prior conviction during his closing argument. Thus, unlike the evidence in Ex parte Minor, the evidence of Snyder’s prior conviction was presumptively prejudicial, but its impact was not egregious.
“The state requested that the trial court give the standard charge on the proper use of Snyder’s prior conviction. The trial court instructed the jury as follows:
“ ‘Now, there has been some testimony offered to the effect that a witness prior to taking the witness stand during this trial has been convicted of a crime. This testimony is allowed to go to you for one purpose, and that is for your consideration in determining what credibility you will give a witness’s testimony from the witness stand in this case. This is for your consideration along with all the other factors in determining whether a witness is worthy of belief in what he says from the witness stand.’
“(Emphasis added.)
“The Court of Criminal Appeals held that plain error had occurred in Snyder’s trial because the trial court
“ ‘did not specifically tell the jury that it could not consider [Snyder’s] prior conviction as substantive evidence that he committed the capital offenses with which he was charged.... [T]he jury could have concluded that [Snyder] committed the charged offenses because he had previously demonstrated a criminal tendency.’
“[Snyder v. State,] 893 So.2d [471] at 477 [(Ala.Crim.App.2001)].
“In Ex parte Minor, the Court was confronted with a situation where the jury was not offered any direction as to the purpose of the prior-conviction evidence. We must now determine if the trial court in this case erred by not specifically instructing the jury that it could not use prior-conviction evidence as ‘substantive evidence of guilt.’
“It is well-settled law that, provided the instructions accurately state the law, a trial court has broad discretion in formulating its instructions to the jury. Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000). In Gaddy v. State, 698 So.2d 1100, 1132-33 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997), Gaddy requested an instruction to the effect that evidence of prior convictions did not constitute evidence that he had committed the charged crime. The requested charge stated: ‘ “I charge you that evidence of other offenses than those charged in the indictment is not to be considered as evidence of the truth of the matters contained in the indictment.” ’ 698 So.2d [at] 1132. The trial *685 court refused to issue the instruction but issued the following instruction:
“ ‘ “I did not tell you when we first talked that the prior robbery conviction that Mr. Gaddy has suffered subsequent to the events in December here in Birmingham is admitted for the sole and limited purpose for you to have at your disposal in assessing his credibility as a witness. The law provides if one has suffered a conviction for an offense involving moral turpitude, such as robbery, then these convictions may be called to the jury’s attention. But it is for the limited purpose for you having that information at your disposal in assessing his trustworthiness.” ’
“698 So.2d at 1183. The Court of Criminal Appeals concluded that that instruction properly informed the jury as to the limited purpose of the evidence of the prior crimes — credibility—and that the giving of that instruction was not plain error. This Court did not overrule Gad-dy in its analysis in Ex parte Minor. See also Johnson v. State, 292 Ala. 208, 291 So.2d 336 (1974)(stating that an instruction on the limited use of the evidence satisfies any need to instruct the jury that the evidence may not be used as evidence of the crime charged).
“The holding in Gaddy is reasonable, sound, and worthy of application to this case. Here, the trial court properly instructed the jury as to the purpose of the evidence of Snyder’s prior conviction. If an instruction clearly informs the jury of the sole purpose of prior-conviction evidence — the witness’s credibility — it is reasonable to assume that the jury would not use the evidence for any other purpose. See, e.g., Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120 (1996)(recognizing that jurors are presumed to follow instructions). Unlike the circumstances in Ex parte Minor, where the jury could have used the testimony for whatever purpose it desired — to determine a witness’s credibility or as substantive evidence of the defendant’s guilt — the trial court in this case informed the jury that the prior-conviction evidence had ‘one purpose’ and that that purpose was to determine credibility; consequently, it eradicated the necessity of informing the jury that it would be improper to use the evidence as substantive evidence of guilt. The unambiguous instruction adequately cautioned the jury, explicitly stated the sole purpose of the testimony, and eliminated the risk that the evidence would be used improperly. Therefore, the emphasis in the instruction on the one purpose of the evidence overcomes a finding that the alleged error ‘has or probably has adversely affected the substantial right of [Snyder].’ Rule 45A, Ala. R.App. P. To hold that the trial court is required to inform the jury that prior-conviction evidence cannot be used as substantive evidence, would unnecessarily limit the trial court’s discretion in forming jury instructions, would restrict defense counsel’s trial strategy, cf. United States v. Barnes, 586 F.2d 1052, 1059 (5th Cir.1978), and in certain circumstances may unnecessarily emphasize the prejudicial evidence. Therefore, while the instruction to the jury must state either that prior-conviction evidence can be used only for the purpose of assessing a witness’s credibility or state that such evidence may not be used as substantive evidence of the defendant’s guilt of the crime charged, it is not reversible error per se if the trial court does not instruct both as to the admissible purpose of the prior-conviction evidence and the purpose for which such evidence may not be considered, *686 unless counsel requests such a two-pronged instruction and the instruction is supported by the evidence.
“Under the facts presented here, the trial court’s instruction to the jury on the use of the evidence of Snyder’s prior conviction was a correct statement of the law; it did not constitute plain error. The judgment of the Court of Criminal Appeals is reversed and this cause is remanded to that court for further review consistent with this opinion.”
(Footnote omitted.)
Finally, both this court and the Alabama Supreme Court have recognized that the decisions in Ex parte Minor and Ex parte Snyder are limited to those cases in which evidence about prior convictions is offered for impeachment purposes. See Johnson v. State, [Ms. 1041313, October 6, 2006] — So.3d — (Ala.2006); Ex parte Martin, 931 So.2d 759 (Ala.2004); Key v. State, 891 So.2d 353 (Ala.Crim.App.2002).
In this case, the evidence about Riley’s prior convictions was offered for impeachment purposes, as was the situation in Ex parte Minor and Ex parte Snyder, rather than for other permissible purposes, as was the situation in Johnson, Ex parte Martin, and Key. Thus, we review the trial court’s failure to instruct the jury on the proper use of evidence about Riley’s prior convictions in light of the decisions in Ex parte Minor and Ex parte Snyder.
In this case, the trial court did not instruct the jury that the evidence about Riley’s prior convictions could not be considered as substantive evidence that he committed the crime charged. See Ex parte Minor. It also did not instruct the jury that the prior convictions could be used solely for the sole purpose of determining Riley’s credibility. See Ex parte Snyder. In fact, the trial court did not give the jury any guidance as to the purposes for which evidence about Riley’s pri- or convictions could or could not be used. Therefore, as was the case in Ex parte Minor, the jury could have used the testimony for whatever purpose it desired — to determine Riley’s credibility or as substantive evidence of Riley’s guilt. Specifically, the jury could have improperly found that Riley intended to kill the victim because he had demonstrated a prior criminal tendency-
In this case, like in Ex parte Minor, the prosecutor emphasized the evidence about Riley’s prior convictions during his cross-examination of Riley. Subsequently, during his rebuttal closing argument, the prosecutor specifically stated:
“We tried to help this guy. He said I’m in juvenile court. Yeah, we tried to rehabilitate him. Didn’t work. That’s what’s wrong with our system that people criticize and you have the power and the authority to do something about it, and you should.”
(R. 763-64) (emphasis added). As a general rule, juvenile adjudications may not be used to impeach a defendant. See Ex parte McCorvey, 686 So.2d 425 (Ala.1996); Bone v. State, 706 So.2d 1291 (Ala.Crim.App.1997); Moore v. State, 333 So.2d 165 (Ala.Crim.App.1976); Love v. State, 36 Ala.App. 693, 63 So.2d 285 (1953). With regard to impeachment by evidence of conviction of a crime, Rule 609(d), Ala. R. Evid., provides that “[e]vidence of juvenile or youthful offender adjudications is not admissible under this rule.” Also, with regard to juvenile court proceedings, § 12-15-72, Ala.Code 1975, provides:
“(a) An order of disposition or other adjudication in proceedings under subsection (a) of Section 12-15-30 shall not be considered to be a conviction or impose any civil disabilities ordinarily resulting from a conviction of a crime or *687 operate to disqualify the child in any civil service application or appointment.
“(b) The disposition of a child and evidence given in a hearing in the court shall not be admissible as evidence against him in any case or proceeding in any other court whether before or after reaching majority, except in a disposition hearing in a juvenile court or in sentencing proceedings after conviction of a crime for the purposes of a presen-tence study and report.”
We recognize that, during cross-examination by the prosecutor, Riley volunteered information about his prior juvenile adjudications and his being sent to boot camp. If that were the only mention of the juvenile adjudications and dispositions, we might find that he invited any error in that regard. However, during his rebuttal closing argument, the prosecutor specifically argued that the State of Alabama had tried to help Riley and had tried to rehabilitate him and that it had not worked, thus implying that Riley was a bad person and that he had intended to commit this offense because he was a bad person. That is precisely what Rule 609, Ala. R. Evid., forbids.
Based on the Alabama Supreme Court’s decisions in Ex parte Minor and Ex parte Snyder, we conclude that the trial court should have given the jury a limiting instruction regarding the proper use of evidence about Riley’s prior convictions. We cannot assume that the jury would have understood, without instruction, that it could use evidence about Riley’s prior convictions only for impeachment, particularly after the prosecutor’s rebuttal closing argument and his inference that Riley was a bad person who could not be rehabilitated. Rather, we must conclude that, under these circumstances, as was the case in Ex parte Minor, the evidence about Riley’s prior convictions was presumptively prejudicial and its impact was egregious and that the trial court’s failure to instruct the jury regarding the proper use of evidence about Riley’s prior convictions rose to the level of plain error. Accordingly, we reverse the trial court’s judgment and remand this case for proceedings that are consistent with this opinion.
REVERSED AND REMANDED.
WELCH, J., concurs. KELLUM and MAIN, JJ., concur in the result. WINDOM, J., dissents, with opinion.