59 So.3d 60 (2010)
Jodey Wayne WALDROP
v.
STATE of Alabama.
CR-07-0148.
Court of Criminal Appeals of Alabama.
March 5, 2010.
Rehearing Denied May 14, 2010.
Certiorari Denied September 24, 2010 Alabama Supreme Court 1091159.
*61 Kristen M. Nelson, Angela Setzer, Bryan A. Stevenson, and Randall S. Susskind, Montgomery, for appellant.
Troy King, atty. gen., and Thomas Govan, Jr., asst. atty. gen., for appellee.
WISE, Presiding Judge.
The appellant, Jodey Wayne Waldrop, was convicted of capital murder for the killing of his infant son, Jodey Chance Waldrop. The murder was made capital because the victim was less than fourteen years of age, a violation of § 13A-5-40(a)(15), Ala.Code 1975. After a sentencing hearing, by a vote of 11-1, the jury recommended that Waldrop be sentenced to death. The trial court followed the jury's recommendation and sentenced him to death. This appeal followed.
Because this is a case in which the death penalty has been imposed, we have reviewed the record for plain error. See Rule 45A, Ala. R.App. P. Although the lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice Waldrop may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala. 1985). Rule 45A, Ala. R.App. P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review... whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 n. 14 (1982)).
The following summary of the relevant facts, as prepared by the trial court, may be helpful to an understanding of this case:
"Evidence indicated that the Defendant was at home on September 22, 2005. The Defendant and his wife planned to go to the North Alabama State Fair that night. The Defendant's wife, Starlette [Tiffany] Waldrop, arranged for babysitters for their children, including the victim, Jodey Chance Waldrop, who was approximately three and a half weeks old at the time. Witnesses testified that they saw the victim, Jodey Chance Waldrop, the afternoon of September 22, 2005. The child appeared to *62 be normal and in good health at that time.
"Starlette Waldrop left the house with her grandmother to make a phone call and get her grandmother's car so they could go to the fair. The Defendant was left alone with the victim and another small child of the Defendant's. Starlette Waldrop arrived back at her residence. The Defendant motioned for her to come in the house. He told her that Jodey Chance Waldrop was not breathing. She picked him up and rushed him to Red Bay Hospital. The child was lifeless and blue. The emergency room staff worked with the child. The child was transported to Children's Hospital in Birmingham, Alabama by helicopter.
"The child was treated at Children's Hospital by Dr. [Jeffrey] Alten. Dr. Alten testified at trial that the child was placed on life support. Dr. Alten testified that diagnostic testing was done, and it was determined that the child was brain dead. The child was taken off life support a couple of days later, and the child died.
"Dr. Alten testified that the type of head trauma that the victim suffered could only be the result of child abuse or an automobile accident. The Department of Human Resources was notified and an investigation began.
"Dr. Alten testified that the child died of being severely shaken and potentially being placed back down on some type of surface. Dr. Alten testified that dropping a child would not cause this type of injury. Dr. Alten testified that only a severe shaking could cause this type of injury.
"An autopsy was performed on the victim after his death. Dr. Emily Ward performed the autopsy. Dr. Ward testified that the child's death was caused by blunt force trauma to the head. Dr. Ward testified that the victim could have been shaken for several minutes.
"The testimony of Dr. Alten and Dr. Ward refuted the testimony and statements of the Defendant."
(C.R. 5-6.)
In addition to the testimony set forth above, Starlette Waldrop testified that Waldrop had questioned whether the victim and another of her four children were actually his children.[1] She also testified that, while they were at the hospital with the victim, Waldrop said something about jumping out of a fourth-floor window and killing himself. Starlette further testified that Waldrop wanted to keep the victim on life support, even though the doctors had determined that he was brain dead. Finally, she testified that, after the victim died, Waldrop said that the victim had been choking, that he tried to perform CPR, and that he tried to do everything he could for the victim.
Peggy Williams Logan, a social worker in the intensive care unit at Children's Hospital, testified that she spoke to Starlette and Waldrop about what had happened to the victim. She summarized Waldrop's response as follows:
"He said that he was ironing his clothes in one room and the oldest child was in the room with him and the young child was in a carriage in another room, in the living room. And when he walked in the room, he noticed the child had blue lips and milk coming from the mouth and that's when he screamed out, and the mother had just driven up."
(R. 1136.)
Agent Charles Treslar of the Alabama Bureau of Investigation testified that he interviewed Waldrop and Starlette at Children's *63 Hospital on September 23, 2005. He testified that, at that time, Waldrop stated as follows:
"After Tiffany left the house on Thursday, 9/22/05, Tiffany was going to drop off the grandmother, Beverly Priest and Roy Wasson and [K.J.] Tiffany was gone 20 minutes. I plugged in the iron and cleaned it off. I got my shorts out of the dryer. I layed my shorts on the bed and went and got [the other child who was there]. I brought him in my bedroom and layed [the other child] on the bed. Jodey Jo was left in the living room in his bouncer. Jodey Jo was fed 3 oz. of food, and then put in his bouncer earlier. While I was ironing, Jodey Jo made a noise. I went to look and saw Similac coming out his nose, bubbling out. I wiped his nose. I wiped it off. I saw Tiffany in the driveway and yelled to please come here. Jodey Jo was not breathing, but I felt his heart beat. Tiffany came in, grabbed Jodey Jo and took off to the hospital. I feel like the doctors are accusing us of hurting him. We are good to our kids. It has mentally stressed me out. I've seen the other kids hit Jodey Jo, but not hard. The kids like to hit and play like Power Rangers. They are kids. If they did, they didn't mean to hurt him. I don't know if they did, but they didn't mean to hurt him."
(C.R. 378.)
Sally Clark testified that she was employed by the Franklin County Department of Human Resources and that she spoke to Waldrop at Children's Hospital on September 25, 2005. She also testified that she asked him about what happened while he was with the victim and another child, and she described his response as follows:
"And he told me he was ironing his clothes, they were getting ready to go out. He had Chance and [another child], they were in the den, and he wasor the living room, and he was ironing in the bedroom. And he went and got [the other child]. He said that [the other child], you had to superhe was a year old and you had to supervise him around the baby, and Chance was in his bouncy seat.
"He went and got [the other child] and brought him back in the bedroom with him and continued ironing his clothes. A few minutes later he said he heard Chance make a whimper sound, and he described it as sounding like a cat. He said he waited a minute, and then went to check on the baby and that's when he noticed that Chance wasn't breathing, and at that very same time he noticed Starlette coming back to the house so he yelled for her to help."
(R. 916-17.) Finally, the following occurred during the State's redirect examination of Clark:
"[PROSECUTOR:] Just one or two other questions. Did you ask the defendant about doing any CPR on the child?
"[CLARK:] I asked what he did when he, you know, the second he realized that Chance wasn't breathing. I don't think I specifically asked CPR, but I just asked what he did when he noticed that the child wasn't breathing.
"[PROSECUTOR:] And what did he tell you?
"[CLARK:] Well, he said, you know, the very second that he noticed the child wasn't breathing that his wife pulled up in the driveway. So I specifically asked, you know, who got the child out of the bouncy seat, and he says that he waited for her to do that. He denied that he picked him up or did anything to get him to breathe.

*64 "[PROSECUTOR:] Did he say he ever shook the child?
"[CLARK:] I specifically asked if he shook the child, and he denied that he did.
"[PROSECUTOR:] Did he say he ever touched the child in any way?
"[CLARK:] He said that he wiped the formula that was coming out of his nose and that was it, but he was still in the bouncy seat when that happened.
"[PROSECUTOR:] When that happened? And that the child's mother came and picked the child up out of the bouncy seat?
"[CLARK:] Correct.
"[PROSECUTOR:] Okay. He didn't say anything about trying to perform CPR on the child?
"[CLARK:] He did not say that to me.
"[PROSECUTOR:] And didn't say anything about trying to feed the child and dropping the child on the floor or anything like that?
"[CLARK:] No. He didn't say that to me.
"[PROSECUTOR:] Okay. But he did ask you if there were going to be any charges made?
"[CLARK:] Correct."
(R. 922-24.)
Agent Marc McCormick of the Alabama Bureau of Investigation testified that he was involved in the investigation of the victim's death and that he spoke to Waldrop on September 26, 2005, the day after the victim died. He also testified that, at that time, Waldrop made the following statement:
"On Thursday 9/22/2005 at approximately 6:00 p.m., I was at home, sitting in the living room feeding Chance. I was sitting on the sectional sofa near the front door. My other son . . . was in the living room with me. Tiffany's grandparents, Derick Nelson and the two older kids were outside. Tiffany and Judy [returned and] Tiffany came in the house. She needed scissors to cut the pictures. I told her where the [scissors] were but she couldn't find them. I had finished feeding the baby and told Tiffany to take the baby while I found the scissors. I told her that she needed to burp him. I found the scissors and gave them to her. Tiffany took the baby outside and I stayed inside with [another child] because Tiffany didn't want to chase him around the yard.
"Judy, Derick, and [one child] leave. A few minutes later, Tiffany, her grandparents and [a second child] leave. At that time I was alone with Chance and [the other child].
"Tiffany laid Chance on the bouncie seat before she left.
"When they left, I went into the bedroom to iron clothes. [Another child] was alone with Chance for a few minutes. I went to the living room and got [the other child] so he wouldn't disturb Chance. The baby seemed fine. He was asleep and appeared to be okay.
"I had been ironing for about ten minutes when I heard an unusual whine coming from the baby that alarmed me. I went to the baby in the living room. I could see formula coming from his nose. I knew something was wrong with the baby. I wiped his nose and felt his chest. I could feel his heart beating but knew he wasn't breathing. He made a noise like he was choking on his formula. I picked him up and laid him over my left shoulder and patted him on his back trying to clear his airway. I laid the baby back in the bouncie chair and tried to give him CPR. I gave him chest compressions and tried to breathe for him. I was trying to do whatever I could for Chance.

*65 "I looked up and saw Tiffany in the driveway. I went to the carport door and called for her to come inside. I don't think she heard me so I called to her again and told her the baby wasn't breathing. Tiffany came inside and picked up the baby. She cradled the baby in her arms and said `breath baby breath' and headed outside to the car. Tiffany drove the baby to the hospital and I followed her in the other car."
(C.R. 380-81.)
McCormick testified that Waldrop made a second statement to him on September 28, 2005. At that time, Waldrop stated:
"On Thursday, 9/22/2005, between 6:00 and 7:00 p.m., I was alone at home with my two children ... I was ironing my clothes in the back bedroom of my home. I heard Chance crying. I went into the living room to check on him. I had fed him earlier and thought he was hungry. Earlier he only took about 3 ounces of baby formula and he usually takes 4 ounces. I held Chance in my left arm and started to give him the remaining ounce of formula from the bottle. I propped the bottle on my shoulder so I could light a cigarette with my right hand. I dropped Chance on the living room floor near the sectional sofa. I picked him up from the floor and wiped away the baby formula that was coming from his nose. Chance was not breathing but his heart was beating. I didn't know what to do. I tried to give Chance CPR. I didn't know what else to do. About that time Tiffany came home. She took the baby to the hospital in Red Bay. I did not hurt Chance on purpose, he slipped from my arms and fell to the floor. When I went to the hospital Tiffany's Grandmother made a comment that made me feel embarrassed. I didn't tell anyone about dropping the baby because I was scared and confused."
(C.R. 383.)
Lieutenant Investigator Greg Pinkard of the Franklin County Sheriff's Department testified that he received a letter from Waldrop on January 29, 2006. In that letter, Waldrop stated:
"Hey! Greg Pinkard. I'm ready to take the voice stress test. However I would like to talk with you before I do. I just want the truth to come out for my son as well as for me the only thing is if I do this I want to have Joey Russian there and also I want you there and I want to know what this will be charged as, no Bullshit please I'm ready to get this over with and I also want one of my questions to be did I give my son CPR and did slam my child or throw my child or hit my child with any thing in the head your answer will be the truth know matter what. Please help me and let me no something today, you told me the next day so now I'm ready."
(C.R. 442.)
Pinkard testified that he received another letter from Waldrop on January 30, 2006. In that letter, Waldrop stated:
"I Jodey Wayne Waldrop am voulantarily [sic] at my on [sic] free will have request to take a stress or polygraph test. I just want the entire truth to be known for I was protecting myself as well as my life by withholding information about the entire truth.
"The day my son got hurt was the most stress out day of my life. My son had been crying all night and all day that day. My wife left me with all the kids 2 or 3 times by myself with the kids. I was trying to get ready, trying to feed, trying to make sure the kids weren't getting dirty and trying to get some money. My wife had already made me mad that morning by shaking *66 the child and me and her had gotten in to it about that. I guess she was [tired] of hearing him cry. Well that afternoon I was just as wrong as she was because I had just start to get ready to go to the fair. My wife had left again and I had [another child] and Jodey to watch while she was gone. [The other child] was in to everything. Jodey was in his bouncer on the couch in the living room. I had just fed him not long ago. I took [the other child] in the bedroom with me and start ironing my clothes. Jodey was crying. I went to see and pick `em up and held him and he didn't stop so I shook him to get him to stop. Well he did. I layed him down and realized he was not breathing so I pick him back up carry him to the sink and put some cold water on his face. Still he was having problems so I layed him down and started CPR on him and he did breath by not a nough so I kept on and thin I raise up and look out and Tiffany was in the driveway and I layed him down in his bouncer and went to the door and told Tiffany. She come in and got him up and tried to get him to breath by shaking him and ran out the door with him and took him to the hospital and I followed with [the other child]. I want you to know I did try to save my child and was not trying to hurt him. I didn't try to make him die. I want you also to know I was on drugs. However I did give him CPR and I didn't know how do that but I did. My child was never slammed in to the wall or anything in the home or any thing else for that matter. I swear it. He was never hit or anything."
(C.R. 444-46.)
Waldrop testified that, on September 22, 2005, he and Starlette were taking care of the children and getting ready to go to the fair. He also testified that, at some point, Starlette left for a short time, and he stayed home with the children and some of their family members. Afterward, when Starlette left with her grandmother for a short time, he was alone with the victim and another child.
Waldrop testified that he was getting ready to iron his clothes and that he took the other child into the bedroom with him and left the victim in his bouncy seat in the living room. He also testified that he heard the victim cry out and that he checked on the victim and picked him up to feed him some more. He further testified that he tried to light a cigarette, that he leaned over, and that he accidentally dropped the victim.
Waldrop testified that he picked up the victim, put him in his bouncy seat, checked him, noticed that he was not breathing, checked for a heartbeat, and shook him a little. When he could not find a heartbeat, he took the victim to a sink and put cold water on his face, but it did not help. He testified that he then put the victim on the floor and started performing CPR on him.
Waldrop testified that, while he was performing CPR, Starlette arrived. He then went to the door and told her to come help him because the victim was not breathing. He testified that Starlette got the victim and shook him and then carried him to the hospital. Finally, he testified that he got the other child and went to the hospital in a different vehicle.
Waldrop admitted that he had made several statements about what happened and stated that most of them were accurate. However, he contended that he was scared to tell the truth and did not know what to do because people started accusing them of child abuse as soon as they got to Children's Hospital.
Waldrop testified that he had previously been charged with assault when he was working for a bail bondsman in Mississippi *67 recovering fugitives who had jumped bond. He explained that, when he went to pick up one such fugitive, the man came to the door with cocaine residue around his mouth and nose, acted like he was going to go with him, and then hit him with a baseball bat. Waldrop testified that, at that point, he hit the man with his handcuffs and injured him. He also testified that he was convicted of assault, that he served almost one year, and that the judge placed him on probation for one year for bounty hunting.
Waldrop testified that he did not intend to hurt the victim and that he did not shake him violently. Rather, he testified that he shook the victim to revive him and accidentally hurt the victim. Finally, he testified that he had smoked marijuana and taken a Xanax on the day the victim was injured.
The State cross-examined Waldrop extensively about the various statements he had made and discrepancies between his statements and his trial testimony. For example, Waldrop admitted that he initially told Treslar that one of the other children may have hurt the victim and omitted any reference to picking up the victim and dropping him. He also admitted that he next made a statement to Sally Clark in which he did not mention picking up the victim, dropping him, or trying to revive him. Waldrop further admitted that, in the first statement he made to McCormick, he did not mention that he dropped or shook the victim and that he may have stated that he performed CPR while the victim was in his bouncy seat rather than on the floor. Finally, he admitted that he wrote, in a letter to Pinkard, that Starlette had shaken the victim earlier that day and that he did not include any reference to dropping the victim.
Waldrop denied that he had ever questioned whether he was the victim's father. He also denied that it took him ten minutes to get to the hospital.
The prosecutor next questioned Waldrop about, and asked him if he had been entirely truthful about, his previous arrest and conviction for assault. First, he pointed out that Waldrop had entered a plea of guilty to aggravated assault and was actually sentenced to five years with six months to serve. Second, he pointed out that the victim of the assault had to have ten staples in his head as a result of the assault and that Waldrop had said he required only a few staples. The prosecutor then asked Waldrop if he had a pattern of minimizing the things he had done, referencing his testimony about the number of staples the victim of the assault required and his testimony about his sentence on the assault conviction.
The prosecutor also questioned Waldrop about what happened while he was on probation on the assault conviction and the fact that he had been charged with conspiring to sell marijuana. Waldrop testified that the charge had been thrown out, but he was still charged with violating the terms of his probation. The following then occurred:
"[PROSECUTOR:] So you do remember that?
"[WALDROP:] I do, yes, sir.
"[PROSECUTOR:] Okay. It all comes back to you now?
"[WALDROP:] It does.
"[PROSECUTOR:] You just happen to have to be reminded
"[WALDROP:] Well, you reminded me, yes, sir. And it brings me exactly
"[PROSECUTOR:] It just wasn't that you were trying to prevent the jury from knowing the full facts about this?
"[WALDROP:] If I was trying to prevent it, sir, I wouldn't even have had my lawyers bring up the assault charge. *68 Because I figured you was going to come to me with that.
"[PROSECUTOR:] And it wasn't the fact that you didn't want the jury to know the whole information that you denied this again today, is it?"
(R. 1642-43.)
During his closing argument, the prosecutor again pointed out the inconsistencies and discrepancies between Waldrop's statements and his trial testimony. He also argued that the State's medical experts refuted Waldrop's explanations about what happened. Further, during his rebuttal closing argument, the prosecutor stated:
[H]e's lied five other times in five other statements. He don't want to say it. You know, finally, he just said, `Oh, yeah, I lied in the handwritten statement where I admitted shaking the baby to death.'
"And then he has the audacity to get up there and lie about his criminal history to you as a juror, thinking we didn't even know, to minimize it just like he's done this entire case. From statement one, two, he had lied, he lied, he lied, he lied, he lied. And now today, he lied. Six times.
"He lied about his criminal record. Oh, it's just a little assault, I did eleven months. Five years, aggravated assault. That's what this is about."
(R. 1803-04.) Finally, he stated:
"When presented with the question of what he did, lied, lied, lied, lied, lied, lied today."
(R. 1811.)
Afterward, the trial court gave its instructions to the jury. During its oral charge, the trial court did not, at any time, instruct the jury as to the purposes for which it could and could not consider evidence about Waldrop's prior conviction.
Waldrop argues that the trial court erred because it did not instruct the jury that it could consider evidence about his prior conviction only for impeachment purposes and not as substantive evidence of guilt. However, he did not first present this argument to the trial court. Therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.
With regard to impeachment by evidence of conviction of a crime, Rule 609, Ala. R. Evid., provides, in relevant part:
"(a) General rule. For the purpose of attacking the credibility of a witness,
"(1)(A) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and
"(1)(B) evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused...."
Also, regarding evidence that is admitted for limited purposes, Rule 105, Ala. R. Evid., provides:
"When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."
In Ex parte Minor, 780 So.2d 796 (Ala. 2000), Minor was convicted of capital murder of a victim who was less than fourteen years of age and sentenced to death for the killing of his two-month-old son, Ebious Jennings. At trial, his defense was that he did not cause the injuries that resulted in the victim's death. During direct *69 examination by defense counsel, Minor admitted that he had prior convictions for second-degree assault, unlawful possession of cocaine, and second-degree rape and that he had escaped from the county jail while he was awaiting trial on the capital murder charge. On cross-examination, he admitted that he had made several inconsistent statements about the incident, but contended that he did so to get released on bond and to protect the victim's mother.
After this court affirmed Minor's conviction, he petitioned the Alabama Supreme Court for review, arguing "that the trial court committed reversible error in failing to properly instruct the jury regarding his prior convictions1) that it could consider the evidence of Minor's prior convictions only for impeachment purposes and 2) that it could not consider the prior convictions as substantive evidence of Minor's guilt." 780 So.2d at 799. The Alabama Supreme Court agreed with Minor, reasoning as follows:
"Minor did not at trial request a limiting instruction regarding the evidence of his prior convictions and did not at trial object to the court's failure to give such an instruction. However, this Court's review of a death-penalty case allows us to address any plain error or defect found in the proceeding under review, even if the error was not brought to the attention of the trial court. Rule 39(a)(2)(D) and (k), Ala. R.App. P.... Even under the stringent standards applicable to plain-error review, we conclude that the failure to properly instruct the jury in a capital-murder case as to the proper use of evidence regarding prior convictions constitutes reversible error.
"When a defendant testifies at trial, the State is entitled to impeach the defendant's credibility by introducing evidence of prior convictions. See Rule 609(a)(1)(B), Ala. R. Evid. In considering the admissibility of prior convictions for impeachment purposes, this Court has stated:
"`The high probability of prejudice against a defendant makes the admissibility of his previous criminal convictions a controversial issue.
"`This notion of prejudice has been said to encompass two tendencies of juries: 1) The tendency to convict not because the defendant is guilty of the charged offense, but because evidence introduced shows he is a bad person who should be incarcerated regardless of his present guilt, and 2) the tendency to infer that, because the defendant committed a prior crime, he committed the crime charged. Thus, a defendant wishing to testify in his own behalf faces this dilemma: Testify and run the risk of greatly prejudicing his defense by introduction of prior convictions to impeach, or refrain from testifying and damage his defense by not telling his side of the story.
"`The rationale for admitting impeachment evidence when a defendant, or any other witness, testifies is that certain evidence of prior criminal acts and general character relates to a person's propensity to lie; therefore, the jury should have and use this evidence, but only for the limited purpose of evaluating the witness's veracity.'
"Mcintosh v. State, 443 So.2d 1283, 1285 (Ala.1983). (Citations omitted.) The law in Alabama is clear that `evidence of prior criminal convictions for impeachment purposes may not be considered or taken into account in determining a defendant's guilt of the offense for which he is prosecuted.' King v. State, 521 So.2d 1360, 1361 (Ala.Crim.App.1987) *70 (quoting 81 Am.Jur.2d Witnesses § 569 at 575 (1976)). It is well settled that when prior convictions are introduced for impeachment purposes the defendant is entitled, upon request, to have the jury instructed that those prior convictions cannot be considered as substantive evidence of guilt of the crime charged. King, supra. The issue in the present case is whether, absent a request or an objection by the defendant, the trial court has a duty to instruct the jury that evidence of prior convictions is not to be considered as substantive evidence of guilt. We hold that the trial court does have such a duty in a capital-murder case.
"Minor testified on direct examination that he had had prior convictions for assault in the second degree, for possession of cocaine, and for rape in the second degree. The Court of Criminal Appeals stated that the evidence of Minor's prior convictions was not admitted for impeachment purposes because it was elicited by Minor's counsel on direct examination. Minor v. State, 780 So.2d [707,] 777 [(Ala.Crim.App.1999)]. We disagree.
"There is no consensus among the jurisdictions as to the proper treatment of a defendant's direct testimony admitting prior convictions. In State v. Smalls, 260 S.C. 44, 194 S.E.2d 188 (1973), upon direct examination, defense counsel elicited from the defendant the fact that he previously had been convicted of the crimes of robbery, grand larceny, and housebreaking. The Supreme Court of South Carolina stated: `When appellant testified, evidence of his prior convictions became admissible solely on the issue of his credibility as a witness.' 260 S.C. at 47, 194 S.E.2d at 189. Thus, the court concluded, the fact that the defendant first testified as to his prior convictions did not preclude his right to have the trial court limit the jury's consideration of his testimony to the issue of credibility. Similarly, in United States v. Diaz, 585 F.2d 116 (5th Cir. 1978), the fact that the defendant testified on direct examination that he had two prior convictions did not preclude the necessity that the trial court instruct the jury that the evidence of prior convictions was to be considered only for a limited purpose. In Commonwealth v. Hurley, 32 Mass.App.Ct. 620, 592 N.E.2d 1346 (1992), the court considered the argument that a defendant who elects to introduce evidence of his prior convictions is not entitled to a limiting instruction because the evidence has not been introduced for impeachment purposes. That court concluded: `Realistically, the defense puts in the evidence only because the prosecution will do so otherwise; the basis for admissibility is the same.' 32 Mass.App.Ct. at 622, 592 N.E.2d at 1347.
"The New Hampshire Supreme Court has held differently. That court has held that a trial court must provide a limiting instruction when evidence of prior convictions is introduced to impeach a defendant's credibility, unless such an instruction is specifically waived by the defendant, but that this rule does not apply when the defendant's prior convictions are admitted during the defendant's direct testimony. State v. Cassell, 140 N.H. 317, 666 A.2d 953 (1995). The Court of Criminal Appeals relied on Cassell in concluding that Minor's failure to request a limiting instruction could be viewed as a trial tactic used in order to prevent calling further attention to Minor's convictions through an instruction to the jury.
"However, to hold that the evidence of Minor's prior convictions was not offered for impeachment purposes would indicate *71 that it was admissible for another purpose, and it was not. Minor's introduction, on direct examination, of evidence regarding his prior convictions was a trial tactic that does not change the purpose for which the evidence was admitted. Minor introduced evidence of these convictions in anticipation that otherwise it would be brought out by the prosecution; his introduction of it does not waive his right to have the jury instructed as to the proper use of it.
"This Court has never addressed the question whether a trial court has a duty to sua sponte instruct the jury as to the limited purpose for which it may consider evidence of prior convictions. The Court of Criminal Appeals has held that the trial court does not have a duty, sua sponte, to inform the jury that evidence of inconsistent statements may be considered only for the purpose of impeaching a witness's credibility. Varner v. State, 497 So.2d 1135 (Ala.Crim.App. 1986); Weaver v. State, 466 So.2d 1037 (Ala.Crim.App.1985). However, Varner and Weaver were not capital cases, and the doctrine of plain-error review did not apply. In addition, those cases do not contain any holding or analysis with respect to impeachment by prior convictions. The Court of Criminal Appeals held in Pardue v. State, 571 So.2d 320, 327 (Ala.Crim.App.1989), rev'd on other grounds, 571 So.2d 333 (Ala.1990), that defense counsel's failure to request a limiting instruction or to object to the trial court's failure to instruct the jury regarding the defendant's prior convictions waived the issue for review. However, Pardue was not a capital case, and the doctrine of plain-error review did not apply.
"The State argues that the trial court was not required to give the jury a limiting instruction, absent a request by Minor, citing Charles W. Gamble, McElroy's Alabama Evidence, § 165.01(2) (5th ed.1996):
"`Once the accused has been impeached by one of the permissible impeachment forms, the defense may want to take steps to minimize or offset the impact of the impeachment. The accused is entitled to have the jury instructed that such evidence is to be considered only as affecting the accused's credibility as a witness and not as tending to show guilt. The court is not required to give such an instruction unless the accused requests that it be given.'
"However, this Court has acknowledged the inherently prejudicial nature of evidence of a defendant's prior convictions. Cofer v. State, 440 So.2d 1121, 1124 (Ala.1983) (`[e]vidence of prior bad acts of a criminal defendant is presumptively prejudicial to the defendant'). `The general exclusionary rule bars the state from introducing evidence of an accused's prior criminal acts for the sole purpose of proving the propensity of the accused to commit the charged offense.' Hobbs v. State, 669 So.2d 1030, 1032 (Ala.Crim.App.1995). Thus, evidence of prior convictions is admissible only for limited purposes. `The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.' Cofer, 440 So.2d at 1123 (quoting Charles W. Gamble, McElroy's Alabama Evidence § 69.01 (3d ed.1977)). The general exclusionary rule `protects the defendant's right to a fair trial' by seeking `"to prevent conviction based on a jury belief that [the] accused is a person of bad character. The jury's determination of guilt or innocence *72 should be based on evidence relevant to the crime charged."' Cofer, 440 So.2d at 1123 (citation omitted). Thus, it naturally follows that the trial court should take all necessary precautions to ensure that when evidence of a defendant's prior convictions is admitted into evidence, the jury is properly instructed on the purpose for which it may consider that evidence. This includes instructing the jury, sua sponte, that it may not consider the evidence of prior convictions as substantive evidence that the defendant committed the charged offense.
"....
"In the present case, the trial court gave this vague instruction on the use of impeachment evidence:
"`Now, evidence has been introduced in this case for the purpose of impeaching certain witnesses and discrediting their testimony.
"`The law allows witnesses to be impeached in any number of ways. For example, a witness may be impeached by proof of convictions of crimes involving moral turpitude or a witness may be impeached by contradictory statements made by the witness either on the stand while testifying or at other times and other places, whether under oath or not.
"`But the fact that a witness has been impeached and successfully impeached does not mean that you must necessarily disregard that witness' testimony, either in whole or in part, for there may be other facts and evidence or other testimony or other evidence that in your judgment may tend to corroborate either all or part of that witness' testimony. And as I have already told you, you are the sole and exclusive judges of the credibility of the witnesses and the weight that you will accord their testimony.'
"The trial court did not tell the jury that the evidence of Minor's prior convictions could not be considered as substantive evidence that he committed the crime charged. Because the jurors were not so instructed, they were free to consider the prior convictions for any purpose; thus, they could consider the probability that Minor committed the crime because he had demonstrated a prior criminal tendency. Allowing the jury to make such use of the evidence was highly prejudicial and constitutes reversible error. See Randolph v. State, 348 So.2d 858 (Ala.Crim.App.1977) (conviction reversed because the trial court failed to adequately distinguish between impeachment evidence and substantive evidence).
"The failure to instruct a jury in a capital-murder case as to the proper use of evidence of prior convictions is error, and that error meets the definition of `plain error.' That failure is `so obvious that [an appellate court's] failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' [Ex parte] Womack, 435 So.2d [766] at 769 [(Ala.1983)]. The Court of Criminal Appeals determined that there was no plain error because the trial court could have `reasonably determined that... defense counsel had elicited Minor's admission of the prior convictions as part of trial strategy and did not want to call additional attention to the evidence through an instruction to the jury.' 780 So.2d at 773. We disagree. Assuming the trial court did believe that the failure to request the instruction was a trial tactic, the trial court could have easily inquired as to whether defense counsel wanted the instruction given. Considering the presumptively prejudicial nature of evidence of a defendant's prior convictions, *73 we consider it incumbent on the trial court to ensure that the jury was instructed on the proper use of such evidence. We conclude that the failure of the trial court to instruct the jury that it could not use such evidence as substantive evidence of guilt `has or probably has' substantially prejudiced Minor; thus, it satisfies the plain-error standard. See Rule 39(a)(2)(D) and (k), Ala. R.App. P.
"Furthermore, the prosecutor drew increased attention to Minor's prior convictions through his cross-examination. On cross-examination, Minor provided details concerning each of the prior convictions. He claimed that the second-degree assault charge was based on a shooting that was done in self-defense; that the second-degree rape charge was based on the statutory rape of a female who had lied about her age; and that the drug-possession charge was based on drugs that were not his. The prosecutor used these elaborations to argue that Minor failed to take responsibility for his actions. Specifically, after Minor testified that he had pleaded guilty to possession of a controlled substance but that the drugs were not his, the following colloquy occurred:
"`[Prosecutor]: So that was not your drugs, either?
"`[Minor]: No, it was not.
"`[Prosecutor]: And you did not kill Ebious?
"`[Minor]: No, I did not kill Ebious.'
"(R. 1259.) Thereafter, the prosecutor commented: `Actually, Mr. Minor, you have got an explanation for everything to minimize your responsibility, don't you?' Considering these statements in light of `1) [t]he tendency [of juries] to convict not because the defendant is guilty of the charged offense, but because evidence introduced shows he is a bad person who should be incarcerated regardless of his present guilt, and 2) the tendency [of juries] to infer that, because the defendant committed a prior crime, he committed the crime charged,' Mcintosh, 443 So.2d at 1285, we must conclude that the trial court's failure to instruct the jury that Minor's prior convictions could not be used for those purposes constitutes a particularly egregious error. Therefore, we reverse the judgment of the Court of Criminal Appeals and remand for that court to order a new trial."
780 So.2d at 799-804 (footnote omitted).
Shortly thereafter, in Snyder v. State, 893 So.2d 482, 485-87 (Ala.2001), the Alabama Supreme Court limited its holding in Ex parte Minor, reasoning as follows:
"This Court, in finding that plain error had occurred in Ex parte Minor, recognized that Minor's testimony was extremely damaging, that the need for an instruction limiting the use of the evidence was obvious, and that the failure to give the instruction was so prejudicial that it affected Minor's substantial rights. While the Court found plain error in the trial court's failure to instruct the jury on the purpose of the evidence of Minor's prior conviction, the Court's holding in that regard did not establish a per se rule. See United States v. Waldrip, 981 F.2d 799 (5th Cir.1993) (clarifying United States v. Diaz, 585 F.2d 116 (5th Cir.1978), and holding that whether a failure to instruct on the limited use of prior-conviction evidence was error was to be determined on a case-by-case basis). Thus, each inquiry regarding the propriety of an instruction on the use of evidence of prior convictions presented for impeachment purposes must be determined on a case-by-case basis.

*74 "In the present case, Snyder testified on direct examination that he had pleaded guilty to second-degree theft of property. At the beginning of the state's cross-examination, the following occurred with regard to that prior conviction:
"`[Prosecutor]: Of course, you said thatI believe you said you caught a case in `87. Is that your word? You caught a case. Is that what you said?
"`[Snyder]: May have, yes, sir.
"`[Prosecutor]: That you caught a case in `87 and that case was theft of property?
"`[Snyder]: Yes, sir.'
"(R. 3111.) The prosecutor did not question Snyder further about this conviction. Nor did the prosecutor emphasize Snyder's prior conviction during his closing argument. Thus, unlike the evidence in Ex parte Minor, the evidence of Snyder's prior conviction was presumptively prejudicial, but its impact was not egregious.
"The state requested that the trial court give the standard charge on the proper use of Snyder's prior conviction. The trial court instructed the jury as follows:
"`Now, there has been some testimony offered to the effect that a witness prior to taking the witness stand during this trial has been convicted of a crime. This testimony is allowed to go to you for one purpose, and that is for your consideration in determining what credibility you will give a witness's testimony from the witness stand in this case. This is for your consideration along with all the other factors in determining whether a witness is worthy of belief in what he says from the witness stand.'
"(Emphasis added.)
"The Court of Criminal Appeals held that plain error had occurred in Snyder's trial because the trial court
"`did not specifically tell the jury that it could not consider [Snyder's] prior conviction as substantive evidence that he committed the capital offenses with which he was charged.... [T]he jury could have concluded that [Snyder] committed the charged offenses because he had previously demonstrated a criminal tendency.'
"[Snyder v. State,] 893 So.2d [471,] 477 [(Ala.Crim.App.2001)].
"In Ex parte Minor, the Court was confronted with a situation where the jury was not offered any direction as to the purpose of the prior-conviction evidence. We must now determine if the trial court in this case erred by not specifically instructing the jury that it could not use prior-conviction evidence as `substantive evidence of guilt.'
"It is well-settled law that, provided the instructions accurately state the law, a trial court has broad discretion in formulating its instructions to the jury. Broadnax v. State, 825 So.2d 134 (Ala. Crim.App.2000). In Gaddy v. State, 698 So.2d 1100, 1132-33 (Ala.Crim.App. 1995), aff'd, 698 So.2d 1150 (Ala.1997), Gaddy requested an instruction to the effect that evidence of prior convictions did not constitute evidence that he had committed the charged crime. The requested charge stated: `"I charge you that evidence of other offenses than those charged in the indictment is not to be considered as evidence of the truth of the matters contained in the indictment."' 698 So.2d at 1132. The trial court refused to issue the instruction but issued the following instruction:
"`"I did not tell you when we first talked that the prior robbery conviction that Mr. Gaddy has suffered *75 subsequent to the events in December here in Birmingham is admitted for the sole and limited purpose for you to have at your disposal in assessing his credibility as a witness. The law provides if one has suffered a conviction for an offense involving moral turpitude, such as robbery, then these convictions may be called to the jury's attention. But it is for the limited purpose for you having that information at your disposal in assessing his trustworthiness."'
"698 So.2d at 1133. The Court of Criminal Appeals concluded that that instruction properly informed the jury as to the limited purpose of the evidence of the prior crimescredibilityand that the giving of that instruction was not plain error. This Court did not overrule Gaddy in its analysis in Ex parte Minor. See also Johnson v. State, 292 Ala. 208, 291 So.2d 336 (1974) (stating that an instruction on the limited use of the evidence satisfies any need to instruct the jury that the evidence may not be used as evidence of the crime charged).
"The holding in Gaddy is reasonable, sound, and worthy of application to this case. Here, the trial court properly instructed the jury as to the purpose of the evidence of Snyder's prior conviction. If an instruction clearly informs the jury of the sole purpose of prior-conviction evidencethe witness's credibilityit is reasonable to assume that the jury would not use the evidence for any other purpose. See, e.g., Taylor v. State, 666 So.2d 36 (Ala.Crim.App. 1994), aff'd, 666 So.2d 73 (Ala.1995), cert, denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996) (recognizing that jurors are presumed to follow instructions). Unlike the circumstances in Ex parte Minor, where the jury could have used the testimony for whatever purpose it desiredto determine a witness's credibility or as substantive evidence of the defendant's guiltthe trial court in this case informed the jury that the prior-conviction evidence had `one purpose' and that that purpose was to determine credibility; consequently, it eradicated the necessity of informing the jury that it would be improper to use the evidence as substantive evidence of guilt. The unambiguous instruction adequately cautioned the jury, explicitly stated the sole purpose of the testimony, and eliminated the risk that the evidence would be used improperly. Therefore, the emphasis in the instruction on the one purpose of the evidence overcomes a finding that the alleged error `has or probably has adversely affected the substantial right of [Snyder].' Rule 45A, Ala. R.App. P. To hold that the trial court is required to inform the jury that prior-conviction evidence cannot be used as substantive evidence, would unnecessarily limit the trial court's discretion in forming jury instructions, would restrict defense counsel's trial strategy, cf. United States v. Barnes, 586 F.2d 1052, 1059 (5th Cir.1978), and in certain circumstances may unnecessarily emphasize the prejudicial evidence. Therefore, while the instruction to the jury must state either that prior-conviction evidence can be used only for the purpose of assessing a witness's credibility or state that such evidence may not be used as substantive evidence of the defendant's guilt of the crime charged, it is not reversible error per se if the trial court does not instruct both as to the admissible purpose of the prior-conviction evidence and the purpose for which such evidence may not be considered, unless counsel requests such a two-pronged instruction and the instruction is supported by the evidence.

*76 "Under the facts presented here, the trial court's instruction to the jury on the use of the evidence of Snyder's prior conviction was a correct statement of the law; it did not constitute plain error. The judgment of the Court of Criminal Appeals is reversed and this cause is remanded to that court for further review consistent with this opinion."
(Footnote omitted.)
Finally, both this court and the Alabama Supreme Court have recognized that the decisions in Ex parte Minor and Ex parte Snyder are limited to those cases in which evidence about prior convictions is offered for impeachment purposes. See Johnson v. State, [Ms. 1041313, October 6, 2006] ___ So.3d ___ (Ala.2006); Ex parte Martin, 931 So.2d 759 (Ala.2004); Key v. State, 891 So.2d 353 (Ala.Crim.App.2002).
In this case, the evidence about Waldrop's prior conviction was offered for impeachment purposes, as was the situation in Ex parte Minor and Ex parte Snyder, rather than for other permissible purposes, as was the situation in Johnson, Ex parte Martin, and Key. Thus, we review the trial court's failure to instruct the jury on the proper use of evidence about Waldrop's prior conviction in light of the decisions in Ex parte Minor and Ex parte Snyder.
This case is not materially distinguishable from Ex parte Minor. Both cases involved babies who were shaken, and both Minor and Waldrop made conflicting statements about what happened to the babies. Also, both Minor and Waldrop had prior assault convictions, which they admitted on direct examination. Further, both Minor and Waldrop claimed they acted in self-defense in the prior offenses, and both were accused by the prosecution of minimizing their participation in the prior offenses. Finally, both Minor and Waldrop appealed their convictions, arguing that the trial court did not properly instruct the jury regarding the proper use of prior-conviction evidence.
In this case, the trial court did not instruct the jury that the evidence about Waldrop's prior conviction could not be considered as substantive evidence that he committed the crime charged. See Ex parte Minor. It also did not instruct the jury that the prior conviction could be used solely for the purpose of determining Waldrop's credibility. See Ex parte Snyder. In fact, the trial court did not give the jury any guidance as to the purposes for which evidence about Waldrop's prior conviction could or could not be used. Therefore, as was the case in Ex parte Minor, the jury could have used the testimony for whatever purpose it desiredto determine Waldrop's credibility or as substantive evidence of Waldrop's guilt. Specifically, the jury could have improperly found that Waldrop intended to kill the victim because he had demonstrated a prior criminal tendency.
Based on the Alabama Supreme Court's decisions in Ex parte Minor and Ex parte Snyder, we conclude that the trial court should have given the jury a limiting instruction regarding the proper use of evidence about Waldrop's prior conviction. We cannot assume that the jury would have understood, without instruction, that it could use evidence about Waldrop's prior conviction only for impeachment. Rather, we must conclude that, under these circumstances, as was the case in Ex parte Minor, the evidence about Waldrop's prior conviction was presumptively prejudicial and its impact was egregious and that the trial court's failure to instruct the jury regarding the proper use of evidence about Waldrop's prior conviction rose to the level of plain error. See also Riley v. State, 48 So.3d 671 (Ala.Crim.App.2009). Accordingly, we reverse the trial court's judgment *77 and remand this case for proceedings that are consistent with this opinion.
REVERSED AND REMANDED.
WELCH, KELLUM, and MAIN, JJ., concur.
WINDOM, J., dissents, with opinion.
WINDOM, Judge, dissenting.
I agree with the majority's determination that the circuit court erred by failing to instruct the jury that it could consider Waldrop's prior aggravated-assault conviction only for impeachment purposes. See Ex parte Minor, 780 So.2d 796 (Ala.2000). However, based on the nature of Waldrop's defense, the manner in which the prosecutor used Waldrop's prior conviction, and the obvious impeachment purpose for the admission of the prior conviction, I disagree that any such error rises to the level of plain error. Rule 45A, Ala. R.App. P. Therefore, I respectfully dissent.
"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal." Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App. 1999). "`"To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations."'" Ex parte Brown, 11 So.3d 933, 938 (Ala.2008) (quoting Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002), quoting in turn Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). That is, "`the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Ex parte Brown, 11 So.3d at 938 (quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). Although the "failure to object does not preclude [appellate] review in a capital case, it does weigh against any claim of prejudice." Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985).
In Ex parte Minor, the case primarily relied upon in the majority opinion, the Alabama Supreme Court held that the circuit court's failure to give an instruction limiting the jury's consideration of Minor's prior convictions to impeachment constituted plain error. 780 So.2d at 802-04. Minor was charged with capital murder for causing the death of his infant son, Ebious. Id. at 797-98. At trial, Minor testified in his defense and "maintained that he did not kill Ebious and that he did not strike Ebious in any way." Id. at 799. During his testimony, Minor was impeached with his prior "convictions for assault in the second degree, for possession of cocaine, and for rape in the second degree." Id. At the conclusion of the trial, the circuit court did not instruct the jury that it could consider Minor's prior convictions only for impeachment purposes. Id.
The Alabama Supreme Court held that the circuit court erred in failing to sua sponte instruct the jury that it could consider Minor's prior convictions only for impeachment purposes. Specifically, the Supreme Court stated:
"The trial court did not tell the jury that the evidence of Minor's prior convictions could not be considered as substantive evidence that he committed the crime charged. Because the jurors were not so instructed, they were free to consider the prior convictions for any purpose; thus, they could consider the probability that Minor committed the crime because he had demonstrated a prior criminal tendency."
*78 Id. at 803. The Supreme Court went on to hold that the "presumptively prejudicial nature of evidence of a defendant's prior convictions," coupled with the possibility that the jury considered Minor's prior convictions as substantive evidence because it has not been given a limiting instruction, constituted plain error. Id. at 804.
In Snyder v. State, 893 So.2d 482, 485 (Ala.2001), the Alabama Supreme Court explained that its decision in Ex parte Minor did not create a per se rule requiring reversal when a limiting instruction was not given on the use of evidence of prior convictions. Instead, the failure to give a limiting instruction must be reviewed on a case-by-case basis. Ex parte Martin, 931 So.2d 759, 768 (Ala.2004); Snyder, 893 So.2d at 485; see also Johnson v. State, [Ms. 1041313, Oct. 6, 2006] ___ So.3d ___, ___ (Ala.2006) ("This Court in Snyder limited the holding of Ex parte Minor by stating that although the Court in Ex parte Minor found `plain error in the trial court's failure to instruct the jury on the purpose of the evidence of Minor's prior conviction, the Court's holding in that regard did not establish a per se rule' regarding such evidence and that `each inquiry regarding the propriety of an instruction on the use of evidence of prior convictions presented for impeachment purposes must be determined on a case-by-case basis.'")(quoting Snyder, 893 So.2d at 485). Applying a case-by-case analysis as mandated by the Alabama Supreme Court, I conclude that the circuit court's failure to give an instruction limiting the jury's consideration of Waldrop's prior convictions did not constitute plain error.
Part of Waldrop's defense was that he "snapped" and killed his three-and-a-half-week-old son, Jodey Chance Waldrop (hereinafter "Chance").[2] Waldrop presented evidence indicating that he had been having financial problems. Waldrop's wife had been engaging in extramarital affairs, and Waldrop and his wife had fought the day Waldrop caused Chance's death. Further, Chance had cried all night the night before and all day on the day of his death. Also, the day he caused Chance's death, Waldrop had used drugs. Based on these facts, Waldrop's counsel argued that Waldrop was overwhelmed and extremely frustrated. Counsel argued that due to his frustration:
"[H]e just snapped at that moment in time from what had built up over the weeks through the course of that marriage, through the suspected infidelities, through the financial problems, through everything, he snapped. And if you believe it's him that he just grabbed a crying baby, and for a brief instant and a moment he did a terrible act.
(R. 1761-62.) According to defense counsel, Waldrop "snapped" and caused the child's death; however, Waldrop did not mean to cause the child's death. Therefore, Waldrop did not have the specific intent necessary for a capital-murder conviction. See (R. 1768) (counsel arguing that Waldrop is "deeply sorry for that momentary loss of control," but did not intend to kill the child).
Based on the representation by Waldrop's counsel that Waldrop "snapped" and assaulted the child but did not intend to cause the child's death, any error in the trial court's failure to instruct the jury that it could consider Waldrop's prior assault conviction for impeachment purposes only did not "`"have an unfair prejudicial impact on the jury's deliberations."'" Ex parte Brown, 11 So.3d at 938 (quoting Ex *79 parte Bryant, 951 So.2d at 727, quoting in turn Hyde v. State, 778 So.2d at 209). It is unreasonable to assume that 12 rational jurors distinguished between an unintentional killing resulting from an assault and an intentional killing based on Waldrop's prior assault conviction. Compare State v. Hebert, 158 N.H. 306, 317, 965 A.2d 1059, 1067 (2009) (holding that the failure to instruct the jury regarding the limited purpose for which it could consider prior convictions was harmless when the defendant did not deny involvement in the offense and the jury was only asked to decide between two versions of the same event), with Ex parte Minor, 780 So.2d at 802-04 (holding that the circuit court's failure to give a limiting instruction regarding prior convictions constituted plain error in a case where the defendant maintained that he did not strike his child or cause his child's death); cf. Barnes v. State, 727 So.2d 839, 843 (Ala.Crim.App.1998) (holding that the admission of evidence indicating that the defendant in a capital-murder (murder/burglary) trial had unrelated outstanding warrants for burglary was not prejudicial because the defendant admitted committing the burglary, thus leaving the jury only to decide between felony murder and capital murder); Brown v. State, 11 So.3d 866, 905-06 (Ala.Crim.App.2007) (same). Because Waldrop asserted that he unintentionally killed his son, he has not established that the circuit court's failure to instruct the jury regarding a prior conviction for assault had an unfair adverse impact on the jury's deliberations. See Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that the appellant/defendant has the burden to establish prejudice relating to an issue being reviewed for plain error). In other words, Waldrop has failed to establish any likelihood that the jury distinguished between capital murder and a lesser unintentional homicide based on his prior conviction for a nonfatal assault. Because Waldrop's prior assault conviction was not inconsistent with his defense that he merely assaulted Chance and did not intend to kill him, I do not believe that Waldrop has established that the circuit court's failure to give a limiting instruction rises to the level of plain error. Ex parte Brown, 11 So.3d at 938.
Additionally, "the State did not present the [prior] conviction to the jury in a manner that would have suggested that [Waldrop] had a propensity to commit the charged [crime] or that would have aroused the jury's sense of horror, outrage or an instinct to punish." Hebert, 158 N.H. at 318, 965 A.2d at 1068. As the majority noted, Waldrop introduced his prior conviction and the facts underlying that conviction on direct examination through defense counsel. The State did not impeach Waldrop with the fact that he had a prior conviction; instead, it elicited testimony indicating that Waldrop had misrepresented the facts underlying his prior conviction during his direct-examination testimony. In other words, the State did not impeach Waldrop with his prior conviction; it impeached him with his prior inaccurate direct-examination testimony.
For instance, during its cross-examination regarding Waldrop's testimony relating to his prior conviction, the State asked, "[y]ou didn't tell us the whole truth about that, did you?" (R. 1635.) The State then, referring back to Waldrop's direct-examination testimony, established that Waldrop had misrepresented the extent of the victim's injuries and had misrepresented the sentence imposed. See (R. 1528) (Waldrop testified on direct examination that his victim required 3 staples in his head as a result of the assault); (R. 1637) (the State elicited testimony that Waldrop's victim actually required 10 staples to close his wound). Further, during its closing argument, the State asserted:

*80 "His whole story is a lie. Before he even says he dropped it, you have to do this to get a baby to be able eat (demonstrating). So the baby was never eating. I can tell you that. And the bottle is right where Starlette left it, in the cup holder.
"Oh, Mr. Wasson must have come in and cleaned up the house while I was gone in one day. That's ridiculous. He wants you to believe that. Not only that, he's lied five other times in five other statements. He don't want to say it. You know, finally, he just said, Oh, yeah, I lied in the handwritten statement where I admitted shaking the baby to death.
"And then he has the audacity to get up there and lie about his criminal history to you as a juror, thinking we didn't even know, to minimize it just like he's done this entire case. From statement one, two, he had lied, he lied, he lied, he lied, he lied. And now today, he lied. Six times.

"He lied about his criminal record. Oh, it's just a little assault, I did eleven months. Five years, aggravated assault. That's what this is about. Ten minutes, ten minutes is what Starlette testified it took [Waldrop] to get to the hospital. Ten minutes. He lived two blocks from the hospital."
(R. 1802-04) (emphasis added.)
As the foregoing shows, the State did not impeach Waldrop with his prior conviction; instead, it impeached him with misrepresentations he made during his direct examination testimony. The manner in which the State used Waldrop's prior conviction, i.e., to establish that he "lie[d] about his criminal history," (R. 1804), did not suggest to the jury that Waldrop had a propensity to commit capital murder. Hebert, 158 N.H. at 318, 965 A.2d at 1068. Nor did the State's impeachment urge the jury to convict Waldrop on some improper basis. Id. Accordingly, I do not believe that Waldrop has met his burden to establish that the circuit court's failure to give a limiting instruction rises to the level of plain error. Ex parte Brown, 11 So.3d at 938.
Finally, the purpose for the State's use of Waldrop's prior conviction was not prejudicial. The State elicited testimony relating to the prior conviction for the sole purpose of attempting to show that Waldrop "lied about his criminal record." (R. 1804.) The State's second question relating to Waldrop's conviction, and more specifically Waldrop's prior testimony relating to that conviction, was: "[Y]ou didn't tell us the whole truth about that, did you?" (R. 1635.) The State then, through pointed questions, established that Waldrop's rendition of the facts underlying his prior conviction was false. (R. 1636-43.) When referring to Waldrop's prior conviction during closing argument, the State focused the jury's attention on the fact that Waldrop had lied in relation to his prior conviction. See (R. 1803-04) ("[H]e has the audacity to get up there and lie about his criminal history to you as a juror.... From statement one, two, he had lied, he lied, he lied, he lied, he lied. And now today, he lied.... He lied about his criminal record."). Based on the manner in which the State used Waldrop's prior conviction, I do not believe that Waldrop has met his burden to establish that the circuit court's failure to instruct the jury that the conviction could only be considered in judging Waldrop's credibility affected the outcome of the trial. Thomas v. State, 824 So.2d 1, 13 (Ala.Crim.App.1999), overruled on other grounds, Ex parte Carter, 889 So.2d 528 (Ala.2004) (recognizing that to rise to the level of plain error, an error must have affected the outcome of the trial).
*81 Because Waldrop's prior conviction was not inconsistent with part of his theory of defense, and the State did not present the prior conviction evidence in a manner that would suggest that Waldrop has a propensity to commit capital murder, I do not believe that the circuit court's failure to instruct the jury regarding the prior conviction had an unfair prejudicial impact on the jury's deliberation or resulted in a manifest injustice. Ex parte Brown, 11 So.3d at 938. Accordingly, Waldrop has failed to establish plain error, and his conviction should be affirmed.
NOTES
[1] The evidence showed that other men were the fathers of Starlette's two oldest children.
[2] Waldrop's defense was actually two-part: 1) he did not cause the child's death; and 2) he injured the child but did not intend to cause the child's death.